# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| **In the Matter of an Application to Search:** ) | |
| ) | Case No. 21-sw-744-STV |
| An Apple I-phone model 11 Pro, IMSI# ) | |
| 310150741536800; having phone number 702- ) | |
| 410-4825 belonging to Daniel ESPINOZA and ) | |
| currently stored in the Colorado State Patrol ) | |
| Evidence Room and more fully described in ) | |
| Attachment A, attached hereto. ) | |

## APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer Keith Soustek, a Criminal Investigator for the DEA Denver Field Division Office, request a search warrant and state under penalty of perjury that I have reason to believe that the following person or property

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the _____State and_____ District of _Colorado_ , there is now concealed:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Possession with Intent to Distribute a controlled substance, Conspiracy |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_s/Keith Soustek_
*Applicant's signature*

Keith Soustek, Task Force Officer, DEA
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: __July 16, 2021__

*Judge's signature*

City and state: __Denver, CO__

Honorable Scott Varholak, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## <u>DESCRIPTION OF PROPERTY TO BE SEARCHED</u>

The DEVICE is an **Apple I-phone model 11 Pro**; *IMSI* # **310150741536800**, which was seized during the execution of a probable cause search of Daniel ESPINOZA'S white Cadillac Escalade vehicle that resulted from an interdictions traffic stop on eastbound Interstate 70 near Georgetown, Colorado.  The DEVICE is being lawfully held in the secure Evidence Room of the Colorado State Patrol Office located at 1096 McIntyre Street, Golden, CO 80401 within the State and District of Colorado.   The Device is in substantially the same state as when it came into the possession of law enforcement.  This warrant authorizes the forensic examination of the DEVICE for the purpose of identifying the electronically stored information described with particularity in Attachment B.

**ATTACHMENT B**

**<u>DESCRIPTION OF ITEMS TO BE SEIZED</u>**

For the Device described in Attachment A (incorporated by reference), the following items, that constitute evidence of violations of **21 U.S.C. §§ 841(a)(1) Possession with Intent to Distribute a Schedule II Controlled Substance,** and **846 Conspiracy to Distribute a Schedule II Controlled Substance** ("Subject Offenses")**:**

1. Any information, notes, software, documents, records, or correspondence pertaining to violations of **Subject Offenses**.

2. Any address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Devices for the purpose of committing violations of **Subject Offenses**.

3. Any information, records, documents, invoices and materials that concern any accounts with an Internet Service Provider pertaining to violations of **Subject Offenses**.

4. Any information, records, documents, invoices and materials that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **Subject Offenses**.

5. Any information related to sources of drugs, including names, addresses, phone numbers, or any other identifying information to include lists of narcotics customers, either specifically enumerated or in coded language;

6. Any information related to the types, amounts, and prices of drugs trafficked as well as dates, places, maps, directions to locations of specific transactions;

7. Any information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device, or that aid in the identification of persons involved in violations of **Subject Offenses**.

8. Any credit card information, bills, and payment records pertaining to violations of **Subject Offenses**.

9. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting a person to, violations of **Subject Offenses**.

10. Any stored information reflecting communications regarding illegal activities among and between members and associates involved in the **Subject Offenses**;

11. Evidence of user attrition showing who used or owned the Device to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, such as photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, saved usernames and passwords, documents, calendars, and browsing history.

12. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data); and any photographic form.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **In the Matter of an Application to Search:**<br><br>An Apple I-phone model 11 Pro, IMSI# 310150741536800; having phone number 702-410-4825 belonging to Daniel ESPINOZA and currently stored in the Colorado State Patrol Evidence Room and more fully described in Attachment A, attached hereto. | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, Keith Soustek, a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, do hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information pertaining to an **Apple I-phone model 11 Pro**, assigned International Mobile Subscriber Identity (IMSI #) number 310150741536800, attributed to **Daniel ESPINOZA**, and in reference to suspected violations of 21 U.S.C. §§ 841, 846 ("Subject Offenses") based on an ongoing investigation into trafficking of heroin and methamphetamine.

2.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish sufficient probable cause that evidence of violations of 21 U.S.C. §§ 841, 846 is present in the cellular phone described.  Material information has not been knowingly omitted and I incorporate Attachments A and B by reference.

3.     The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to locate information described in Attachment B.

4.     Your Affiant, Keith Soustek, is a Task Force Officer with the Drug Enforcement Administration ("DEA") located within the United States Department of Justice.  As a Task Force Officer with the DEA, I am authorized, pursuant to 21 U.S.C. § 878, to conduct investigations, to execute search warrants, and to make arrests for any offense against the United States.  I am a "Federal Law Enforcement Officer" within the meaning of FED.R.CRIM.P. 41(a)(2)(C).

5.     Your Affiant has been a Task Force Officer assigned to the Denver Field Division Drug Enforcement Administration Enforcement Group 2 and has been assigned since January 2019.  Prior to that, your Affiant has been a Police Officer for the Westminster Police Department since April 2016.  During my time with the Westminster Police Department, your Affiant was assigned to the Patrol Division.  Prior to the Westminster Police Department your Affiant was a Police Officer, Detective, and Corporal for the Brighton Police Department in Brighton, Colorado.  While with the Brighton Police Department, your Affiant was assigned to the North Metro Task Force from 2008-2014 as a Narcotics Detective.  Your Affiant started his law enforcement career in 2003 with the Fort Lupton Police Department and has been in law enforcement for 16 years.  Your Affiant has participated in numerous drug trafficking investigations during the course of which your Affiant has (a) conducted electronic and physical surveillance; (b) debriefed and managed witnesses, cooperators and confidential sources of information who have been involved in drug trafficking and money laundering; (c) monitored wiretapped conversations of individuals committing drug trafficking and money laundering schemes and reviewed line sheets prepared by wiretap monitors; (d) worked in an undercover

capacity to gather information about drug trafficking and money laundering; (e) executed search warrants at locations where records and evidence of drug trafficking and money laundering have been found; and (f) reviewed and analyzed organization records, including telephone records, bank records, records kept and maintained by drug traffickers, and property records. Your Affiant's experience is not limited to drug investigations

6. Your Affiant has had experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and documentation and the detection of proceeds from drug trafficking. Your affiant also has experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large-scale controlled substance distribution operations.

7. Your Affiant knows, based on training and experience, as well as from information relayed to him during the course of his official duties:

a. That a significant percentage of heroin, methamphetamine, cocaine and fentanyl imported into the United States, currently enters the United States domestic market at various points along the Southwest border of the United States, and is then transported to various cities throughout the United States for retail distribution. Furthermore, your Affiant knows that the importation, transportation, and distribution of heroin, methamphetamine, cocaine and fentanyl are controlled by a number of well-organized and sophisticated drug trafficking organizations. Your Affiant also knows that drug trafficking organizations use couriers to transport drugs by vehicle from Mexico to various distribution centers in the United States; they use couriers to transport cash proceeds of drug sales from points of distribution in the United States back to Mexico, where the proceeds are laundered; and they use "stash houses," premises in which they warehouse large quantities of narcotics prior to their distribution.

b. That drug traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of drugs, money, and/or other drug related assets are stored. Therefore, one or more locations are often used to store

lesser amounts of drugs, money, and/or drug related assets, and additional locations are used to meet customers.

c.   That persons involved in large scale drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, amounts of jewelry, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities.

d.   The members of these organizations routinely utilize communication facilities including cellular telephones, satellite telephones, encryption capable UHF transceivers/two-way radios, facsimile machines, electronic mail, text messaging, and various massaging apps to communicate with other organization members in furtherance of their illegal goals.  During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection.  Based on training and experience, your Affiant knows that narcotics traffickers commonly use prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change these devices frequently to avoid detection by law enforcement officials.

e.   That drug dealers use telephones, portable cellular telephones, pagers, and other communication devices and maintain telephone and address books, telephone bills and other books and papers which reflect names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

f.   That drug trafficking organizations store information pertaining to drug trafficking activities on electronic devices, including cell phones, pagers, computers, and external hard drives.  Your Affiant further knows, based on training and experience, as well as from information relayed to your Affiant during the course of official duties, that drug trafficking organizations often retain, for long periods of time, such documents and devices, in order to maintain a record of accounts, income, expenditures, assets, and drug-related debts.

g.   Your Affiant knows, based on training and experience, as well as from information relayed to him during the course of official duties, that narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement.  For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone.  Based on training and experience, your Affiant knows that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking.  Based on training and experience, while such phones may no longer be used

for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

h.   That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product; and that these traffickers often maintain these photographs at their premises, within vehicles, or as stored electronic images.

i.   That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations.

j.   There are many reasons why drug traffickers maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer related evidence.  However, that evidence may still be retrievable by a trained forensic computer expert.

8.   I have spoken with other Task Force Officers and Agents about this and other similar cases, and I have spoken with narcotics experts regarding methods of operation utilized by subjects who manufacture, distribute, traffic, and/or sell controlled substances. Furthermore, I receive near-daily training working on drug investigations for the Denver DEA Field Division as a Task Force Officer.

9.   The information contained in this affidavit is based on my previously described training and experience, my personal observations, as well as information imparted to me by other law enforcement officers involved in this investigation.  This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## <u>IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED</u>

10.     An **Apple I-phone model 11 Pro**, assigned *International Mobile Subscriber Identity* (**IMSI #**) number **310150741536800** (the "**Device**") was discovered during an interdiction traffic stop on June 29, 2021 on Interstate 70 near Georgetown, Colorado.   The Device was found in possession of **Daniel ESPINOZA** at the time of the stop and subsequent arrest.  The Device is being held in evidence in the Colorado State Patrol Evidence room, located at 1096 McIntyre Street, Golden, CO 80401.

11.     I submit there is probable cause to believe that the Device contains evidence of violations of 21 U.S.C. §§ 841(1)(a) and 846.  The applied-for search warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

12.     The Device is currently in the lawful possession of the Colorado State Patrol in the State and District of Colorado.  Although there might already exist the authority to examine the Device, I am seeking a formal search warrant to ensure that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

13.     In my training and experience, I know that the Device has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Colorado State Patrol.

## <u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>

14.     Based on my training and experience, I use various technical terms and descriptions to convey the following meanings:

a.  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.

b.  Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices.  A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices.  A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords.  Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.  Such phones may also contain

removable storage media, such as a flash card—such devices can store any digital

data, and can have the capacity to store many gigabytes of data.

c.  Wireless telephones may also be "smartphones," such that they operate as personal

computers capable of accessing the Internet.  Such smartphones can also operate as

Global Positioning System (GPS) navigation devices and can store information

about their physical locations.  GPS navigation devices can give a user driving or

walking directions to another location.  Smartphones can contain records of the

addresses or locations involved in such navigation. As background, GPS consists of

24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely

accurate clock.  Each satellite repeatedly transmits by radio a mathematical

representation of the current time, combined with a special sequence of numbers.

These signals are sent by radio, using specifications that are publicly available.  A

GPS antenna on Earth can receive those signals.  When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can

mathematically calculate the antenna's latitude, longitude, and sometimes altitude

with a high level of precision.

d.  Smartphones also contain digital cameras.  A digital camera is a camera that records

pictures as digital picture files, rather than by using photographic film.  Digital

cameras use a variety of fixed and removal storage media to store their recorded

images.  Images can usually be retrieved by connecting the camera to a computer or

by connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard drives.

Most digital cameras also include a screen for viewing the stored images.  This

storage media can contain any digital data, including data unrelated to photographs

or videos.  The digital camera can also mark a photo with location data so that upon examination it can be determined where and when a photo was taken. These images can sometimes be recovered even if the user has deleted the image.  The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers.

    e.   Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations.  They can also operate as a "tablet," or mobile computer, and can contain software programs called applications.  Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.  They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

15.    Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, smartphone, digital camera, and GPS navigation device.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

16.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed on the Internet are typically stored for some period of time on an electronic device.  This information can sometimes be recovered with forensics tools.

17.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

18.      *Forensic evidence*.  As further described in Attachment B, this application for warrant seeks permission to locate not only electronically stored information on the Device that might serve as direct evidence of the crimes described, but also forensic evidence that establishes how the Device was used, the purpose of the use, who used the Device, and when it was used. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  This information can be recovered months or even years after it has been downloaded onto the storage medium, deleted, or viewed.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that if an electronic device is used to commit a crime of this type then it may contain: data that is evidence of how the electronic device was used, data that was sent or received, GPS data and photographs, and communications involved in the commission of the crimes referenced in this Affidavit.

19.  *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device consistent with the warrant.  The warrant Your Affiant is applying for would authorize a later examination and perhaps repeated review of the Device or information

from a copy of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

20.     *Need to review evidence over time and to maintain entirety of evidence.* Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well

as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

21.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## OVERVIEW OF INVESTIGATION

22.     The United States, including the DEA, is conducting a criminal investigation of Daniel ESPINOZA regarding violations of the Subject Offenses.

23.     This investigation was initiated based on information developed through an interdiction traffic stop conducted by DEA Enforcement Group 2 Task Force Officers Matthew Bowman and Keith Soustek.

24.     This investigation was initiated based on a proactive highway criminal interdiction traffic stop.  On June 29, 2021, DEA Enforcement Group 2 TFO Matthew Bowman was working criminal interdiction operations, in his capacity as a State Trooper with the Colorado State Patrol Smuggling, Trafficking Interdiction Section/K-9 Unit.  The interdiction operation was focused on eastbound Interstate 70 in Clear Creek County, State of Colorado. The intent of the operation was to increase traffic safety on Interstate 70 while simultaneously pursuing individuals utilizing the Interstate 70 corridor to transport illegal commodities.  During the interdiction operation, TFO Bowman contacted a vehicle driven by Daniel ESPINOZA and during a probable cause search of ESPINOZA's vehicle, TFO Bowman located approximately 14.93 kilograms of suspected heroin, methamphetamine and counterfeit fentanyl tablets.

## FACTS OF THE INVESTIGATION AND PROBABLE CAUSE

25.     On June 29, 2021, at 1:55 p.m., TFO Bowman was stationary in his CSP patrol cruiser in the area of Interstate 70, milepost 221, in Clear Creek County, State of Colorado, observing eastbound vehicles on Interstate 70. TFO Bowman observed a white in color **Cadillac Escalade** (Nevada registration "**415-ZGZ**", **VIN:1GYFC23229R179896**, registered to **Daniel ESPINOZA**, 3822 Haddock Avenue, Las Vegas, NV 89115) pass TFO Bowman's location in the far-left lane of Interstate 70 eastbound.  As the white Escalade passed TFO Bowman's location, TFO Bowman noted the white Escalade was not actively passing any other vehicles, in violation of Colorado Revised Statute 42-4-1013(1).  As the white Escalade passed TFO Bowman's location, TFO Bowman also noted the white Escalade had extremely dark window tint applied to the driver's side windows, preventing TFO Bowman from observing any occupants within the white Escalade.  After the white Escalade passed TFO Bowman's location, TFO Bowman proceeded eastbound on Interstate 70.  While traveling eastbound on Interstate 70 behind the white Escalade, TFO Bowman visually estimated the white

Escalade was speeding (the posted speed limit on this portion of Interstate 70 is 65 miles per hour (MPH)). TFO Bowman confirmed his observation by measuring the white Escalade's speed utilizing a mounted Stalker radar system which measured the white Escalade's speed at 71 MPH, in violation of Colorado Revised Statute 42-4-1101(1).  Additionally, TFO Bowman observed the white Escalade change lanes from the far-left lane to the far-right lane of Interstate 70 in front of a tractor trailer, forcing the tractor trailer to follow the white Escalade at a hazardously close distance, in violation of Colorado Revised Statute 42-4-1007(1)(a).

26.     At 1:59 pm, TFO Bowman initiated a traffic stop with the white Escalade by activating his patrol cruiser's emergency lights while positioned directly behind the white Escalade in the far-right lane of Interstate 70 eastbound. TFO Bowman noted the driver of the white Escalade delayed pulling over for several seconds after TFO Bowman activated the emergency lights. The driver of the white Escalade bypassed a wide shoulder and came to a stop positioned next to a guardrail, placing TFO Bowman in danger of being struck by passing traffic if TFO Bowman were to approach the white Escalade at this location. Due to the hazardous location of the stop, TFO Bowman remained in his patrol cruiser and called out to the driver of the white Escalade utilizing a "PA" system. Utilizing the PA system, TFO Bowman instructed the driver of the white Escalade to continue eastbound to the next exit off Interstate 70, which TFO Bowman knew was less than one (1) mile east of his current location. TFO Bowman could observe the driver of the white Escalade's face in the driver's side mirror and the driver motioned that he understood TFO Bowman's instructions. While observing the driver of the white Escalade's face in the side mirror, TFO Bowman noted the driver's facial expression was consistent with the driver experiencing high stress/anxiety. The driver of the white Escalade complied with TFO Bowman's instructions, he continued eastbound, took exit 226, and came to a

stop in the parking lot of the Georgetown Railroad, located at 646 Loop Drive, Georgetown, CO 80444.

27.     TFO Bowman approached the white Escalade on the driver's side and explained the reason for the stop, requesting the driver's license and vehicle paperwork.  The driver was identified by a Nevada driver's license as Daniel Espinoza, date of birth 03/17/96 (ESPINOZA). ESPINOZA was the registered owner of the vehicle.  There was also a female seated in the front passenger seat of the white Escalade, identified by Nevada driver's license as Cristal Herrera, (HERRERA).  While standing near the open driver's window, TFO Bowman noted an overwhelming odor of air freshener/fragrance emitting from the interior of the white Escalade. TFO Bowman subsequently asked ESPINOZA to accompany TFO Bowman back to the patrol cruiser for the enforcement action. ESPINOZA agreed to TFO Bowman's request and exited the white Escalade.  TFO Bowman escorted ESPINOZA to the patrol cruiser and offered for ESPINOZA to sit in the front passenger seat of the patrol cruiser.  ESPINOZA accepted TFO Bowman's offer to sit in the patrol cruiser.  After ESPINOZA entered the front passenger seat of the patrol cruiser, TFO Bowman noted ESPINOZA sat on the outside edge of the front passenger seat, with his body bladed away from TFO Bowman and he left the front passenger door open.

28.     TFO Bowman spoke with ESPINOZA while completing administrative functions related to the traffic stop.  During this conversation, ESPINOZA related he was traveling from Las Vegas, Nevada to Denver, Colorado to visit HERERRA's cousin, for a few days. ESPINOZA related HERRERA was his "friend" and related they were not romantically involved. ESPINOZA related he planned to get a hotel upon his arrival in Denver, but related he had not yet made hotel arrangements. ESPINOZA related he was not aware of where in Denver HERERRA's cousin resided. ESPINOZA related he was just following his GPS. When asked if he had ever been to Colorado before, ESPINOZA related he had not.  Prior to initiating the

traffic stop with the white Escalade, TFO Bowman queried the white Escalade's license plate through an automatic license plate reader (ALPR) system and learned just four (4) days prior, the white Escalade had traveled eastbound and westbound on Interstate 70 in Colorado, with an approximate fifteen (15) hour turnaround. TFO Bowman's observation of the ALPR data, coupled with ESPONOZA's response to this question, was significant to TFO Bowman. TFO Bowman asked ESPINOZA if he (ESPINOZA) was sure he had never traveled through this area before. TFO Bowman told ESPINOZA that TFO Bowman remembered seeing the white Escalade a few days ago, traveling on I-70 in Colorado. TFO Bowman noted ESPINOZA had a significant emotional response to TFO Bowman's statement. ESPINOZA's eyes widened, ESPINOZA looked over at the white Escalade and he did not respond for several seconds. ESPINOZA then turned to TFO Bowman and responded "no"; TFO Bowman observed ESPINOZA's anxiety heightened dramatically as he began breathing heavily. ESPINOZA's heart began beating rapidly, visible in his stomach/chest area. ESPINOZA began continuously pursing/puckering his lips, he looked downward and began tapping his leg with his hand.

29.     TFO Bowman returned ESPINOZA's documents and presented him with a written warning form. After being presented with the written warning and his documents, ESPINOZA's mood lightened dramatically. ESPINOZA became very talkative and friendly. It was apparent to TFO Bowman that ESPINOZA was immensely relieved after being issued the written warning paperwork. TFO Bowman noted ESPINOZA had a valid driver's license, did not have any outstanding warrants and was advised early on during the traffic stop that he would only be receiving a warning for the minor traffic violation for which he was pulled over. TFO Bowman then asked ESPINOZA if TFO Bowman could speak with him further, ESPINOZA agreed. TFO Bowman asked ESPINOZA if there was anything illegal in the white Escalade and asked ESPINOZA specifically about weapons, large sums of US Currency, and illegal narcotics to

include, heroin, methamphetamine, cocaine and fentanyl pills.  TFO Bowman noted a significant emotional response was triggered with ESPINOZA upon TFO Bowman asking if there were any illegal drugs located within the white Escalade.  ESPINOZA denied the presence of any such items.  TFO Bowman then asked ESPINOZA for consent to search the white Escalade. ESPONOZA almost immediately responded "no", refusing consent to search.  TFO Bowman asked ESPINOZA why he refused consent to search.  ESPINOZA redirected the question and asked why TFO Bowman wanted to search the white Escalade.  TFO Bowman partially explained his suspicious of ESPINOZA.  ESPINOZA then granted TFO Bowman consent to search.  TFO Bowman explained to ESPINOZA that the consent to search request was voluntary. ESPINOZA related TFO Bowman could search, but that he (ESPINOZA) would rather TFO Bowman didn't search; TFO Bowman did not accept ESPINOZA's statements as consent to search and advised ESPINOZA that TFO Bowman wanted to deploy his K-9 partner on the white Escalade.  TFO Bowman asked ESPINOZA if that was "okay" with him, referring to the K-9 deployment.  ESPINOZA related that was okay with him.

30.     TFO Bowman asked ESPINOZA to exit the patrol cruiser and ESPINOZA agreed to allow TFO Bowman to conduct an exterior pat down of ESPINOZA's clothing for weapons. No weapons were located on ESPINOZA's person. TF O Bowman asked ESPINOZA if he (ESPINOZA) was responsible for everything currently located within the white Escalade. ESPINOZA asked TFO Bowman for clarification.  TFO Bowman further explained, if a search of the white Escalade was conducted, if he (ESPINOZA) was responsible for everything currently located in the white Escalade, to include any bags, items, or other articles.  ESPINOZA replied "yeah".  TFO Bowman approached the white Escalade and spoke with HERERRA. HERERRA related she and ESPINOZA were traveling to her cousin's address.  HERERRA

related her cousin's twins recently had a birthday.  HERRERA related she had never been to Colorado previously, before this trip.

31.    TFO Bowman returned to the patrol cruiser and requested cover through CSP dispatch prior to the K-9 deployment, for officer safety reasons.  TFO Bowman invited ESPINOZA to sit back in the front passenger seat of the patrol cruiser and explained to ESPINOZA that TFO Bowman wanted to wait for a cover officer prior to the K-9 deployment, ESPINOZA acknowledged and indicated TFO Bowman could do whatever he needed to do. TFO Bowman explained to ESPINOZA that he (ESPINOZA) did not have to remain on scene. TFO Bowman offered for the cover officer to give ESPINOZA a courtesy ride somewhere from the scene during the time TFO Bowman conducted further investigation with the white Escalade.  ESPINOZA related it didn't matter and did not request to leave.

32.    At 2:27 pm, Sergeant K. Gould and Deputy Collins with the Clear Creek County Sheriff's Office arrived to assist TFO Bowman. TFO Bowman briefly explained the circumstances to the cover officers and then approached the white Escalade to speak with HERERRA.  TFO Bowman explained to HERERRA that a K-9 would be deployed on the white Escalade and offered for HERERRA to sit in one of the patrol vehicles.  HERERRA and ESPINOZA voluntarily sat in the Clear Creek County Sheriff's cruisers, it was currently raining heavily outside.

33.    At 2:29 pm, TFO Bowman deployed his K-9 partner "Mason" for an exterior free air sniff of the white Escalade.  TFO Bowman and his K-9 partner "Mason" are a highly successful narcotics detection canine team, dually certified by Utah POST and by the Colorado Police Canine Association (CPCA) in narcotics detection.  K-9 Mason is a single purpose narcotics detector canine and is certified in detecting three (3) illegal narcotic odors; heroin, cocaine and methamphetamine.  K-9 Mason is not trained to alert to the odor of marijuana. TFO

Bowman and K-9 Mason have worked together as a narcotics detection canine team since April, 2019. Prior to the K-9 deployment, TFO Bowman noted it was approximately 60-70 degrees outside, it was currently raining with a mild wind. During a free air sniff of the white Escalade, K-9 Mason alerted to the odor of illegal narcotics emitting from the interior of the white Escalade. During K-9 Mason's second detailed pass around the exterior of the white Escalade, K-9 Mason displayed an abrupt change of behavior on the driver's side of the white Escalade; K-9 Mason began "bracketing" back and forth between the middle of the white Escalade and the engine compartment, on the driver's side. K-9 Mason did not want to leave this area, he began primarily breathing through his nose and was frantically searching this area of the white Escalade for the source of illegal narcotic odor as he dove underneath the white Escalade numerous times on the driver's side, and front, under the engine compartment.

34.     At 2:33 pm, TFO Bowman began a probable cause search of the white Escalade based on K-9 Mason's alert to illegal narcotic odor during the free air sniff. During the search, TFO Bowman quickly identified an area of interest in the rear storage compartment of the white Escalade. Within the rear storage compartment, TFO Bowman located a large subwoofer box which was approximately two (2) feet tall and ran the length of the white Escalade from side to side. The subwoofer box had the word "SINALOA" in large bold letters across the front. Upon inspection of the three speakers mounted to the subwoofer box, TFO Bowman noted there were screws missing, some of the screws were different than the others, many of the screws were stripped and the screws affixing the speakers to the box were heavily tooled; it was apparent to TFO Bowman these speakers had likely been on and off on numerous occasions. TFO Bowman manipulated the speaker box and noted the speaker box was extremely heavy. Upon shaking the box side to side, TFO Bowman could hear items moving around within the box. TFO Bowman

was highly suspicious the speaker box currently contained contraband and proceeded to remove

one of the speakers for further inspection.

35.     Upon removing the speakers, TFO Bowman located thirty-six (36) packages of

suspected contraband within the speaker box.  Eight (8) were cylindrical packages of suspected

methamphetamine with a gross weight of 7.37 kilograms, with "TATA" written on the outside of

the packages in black ink (EXHIBIT #1).  Eight (8) were brick-shaped packages of suspected

heroin with a gross weight of 4.64 kilograms with "CRV" written on the exterior of the packages

in black ink (EXHIBIT #2).  Twenty (20) were small brick-shaped packages containing

suspected fentanyl tablets with a gross weight of 2.92 kilograms with an underlined "F" written

on the exterior of the packages in black ink (EXHIBIT #3).  Based on the weight, size and

manner of packaging, TFO Bowman immediately suspected the packages contained a

combination of heroin, methamphetamine and counterfeit fentanyl pills based on prior seizures

with similar packaging and markings.  Based on the weights, manner of packaging and markings,

TFO Bowman recognized these suspected controlled substances were packaged for distribution

and were likely owned and being transported for a large-scale drug trafficking organization

(DTO).

36.     At 2:36 pm, TFO Bowman and assisting officers arrested ESPINOZA and

HERRERA.  During the arrest of ESPINOZA, TFO Bowman conducted a search of

ESPINOZA's person.  During the search of ESPINOZA's person, TFO Bowman located two

small baggies containing suspected cocaine within one of ESPINOZA's front pant pockets

(EXHIBIT #4).  TFO Bowman asked ESPINOZA if he would be willing to deliver the

contraband to the intended receiver in Denver, CO.  ESPINOZA related he did not want to

answer any questions.  ESPINOZA and HERERRA were subsequently transported from the

scene to the Clear Creek County Sheriff's Office by Clear Creek County Deputies.

37.     TFO Bowman remained on scene and further processed the white Escalade and took several photographs.  CSP K-9 Trooper Nathan McDowell also responded to assist with the on-scene processing of the white Escalade.  Due to the complex engineering of the white Escalade with numerous natural voids that needed to be searched for further contraband and evidence, TFO Bowman sealed the white Escalade with CSP evidence tape to later apply for a search warrant for further examination.  The white Escalade was towed to the Colorado State Patrol Troop 1A substation located at 1096 McIntyre Street, Golden, CO 80401 by Allied towing.  This location is a secure law enforcement facility and the white Escalade has been stored at this location since June 29, 2021.

38.     TFO Bowman spoke with DEA EG2 TFO Keith Soustek and requested TFO Soustek's assistance with this investigation.  TFO Soustek responded to the Clear Creek County Sheriff's Office and conducted interviews.  After clearing from the scene of the traffic stop, TFO Bowman responded to the Clear Creek County Jail to assist TFO Soustek with interviews.  ESPINOZA cooperated with an interview regarding an attempt to further the investigation and conduct a controlled delivery of the suspected narcotics to the Denver-based receiver.  ESPINOZA was not advised of his Miranda Rights prior to this interview.  ESPINOZA subsequently decided to not cooperate with a controlled delivery and was subsequently booked into the Clear Creek County Jail on state charges.

## AUTHORIZATION REQUEST

39.     Based on the information described above, probable cause exists to believe that, on June 29, 2021, Daniel ESPINOZA had engaged in an attempt to distribute a controlled substance and in a conspiracy involving drug trafficking, in violation of Title 21, United States Code, Sections 841 and 846.

40.     Also, probable cause exists to believe that ESPINOZA possessed and used the DEVICE and that evidence related to violations of Title 21, United States Code, Sections 841 and 846, as enumerated with particularity in Attachment B, is presently located on the DEVICE as identified in Attachment A.

41.     Based upon training and experience, your Affiant believes that a forensic examination of the DEVICE would result in the discovery of evidence of drug trafficking including call records; SMS and WhatsApp text and voice messages with co-conspirators related to drug sales and the disposition of bulk currency proceeds of drug sales; and information related to the identity and roles of suppliers, customers, and other unknown co-conspirators.

42.     Your Affiant respectfully requests that the Court issue a search warrant, which authorizes the forensic search of the DEVICE, as identified in Attachment A, for items described with particularity in Attachment B.

## CONCLUSION

Based on the description above, I believe probable cause exists that inside the DEVICE (described in Attachment A), will be found evidence of violations of 21 U.S.C. §§ 841(1)(a) and 846 (described in Attachment B).  Therefore, I respectfully request that the attached warrant be granted, authorizing the search of the DEVICE described in Attachment A and the seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

_s/Keith Soustek_
Keith Soustek
Task Force Officer - DEA

SUBSCRIBED and SWORN through reliable telephonic means on __16th__ day of July 2021

Honorable Scott Varholak

UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by **Wayne Paugh**, Assistant United States Attorney.

## ATTACHMENT A

## <u>DESCRIPTION OF PROPERTY TO BE SEARCHED</u>

The DEVICE is an **Apple I-phone model 11 Pro**; *IMSI* # **310150741536800**, which was seized during the execution of a probable cause search of Daniel ESPINOZA'S white Cadillac Escalade vehicle that resulted from an interdictions traffic stop on eastbound Interstate 70 near Georgetown, Colorado.  The DEVICE is being lawfully held in the secure Evidence Room of the Colorado State Patrol Office located at 1096 McIntyre Street, Golden, CO 80401 within the State and District of Colorado.   The Device is in substantially the same state as when it came into the possession of law enforcement.   This warrant authorizes the forensic examination of the DEVICE for the purpose of identifying the electronically stored information described with particularity in Attachment B.

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

For the Device described in Attachment A (incorporated by reference), the following items, that constitute evidence of violations of **21 U.S.C. §§ 841(a)(1) Possession with Intent to Distribute a Schedule II Controlled Substance,** and **846 Conspiracy to Distribute a Schedule II Controlled Substance** ("Subject Offenses")**:**

1. Any information, notes, software, documents, records, or correspondence pertaining to violations of **Subject Offenses**.

2. Any address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Devices for the purpose of committing violations of **Subject Offenses**.

3. Any information, records, documents, invoices and materials that concern any accounts with an Internet Service Provider pertaining to violations of **Subject Offenses**.

4. Any information, records, documents, invoices and materials that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **Subject Offenses**.

5. Any information related to sources of drugs, including names, addresses, phone numbers, or any other identifying information to include lists of narcotics customers, either specifically enumerated or in coded language;

6. Any information related to the types, amounts, and prices of drugs trafficked as well as dates, places, maps, directions to locations of specific transactions;

7. Any information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device, or that aid in the identification of persons involved in violations of **Subject Offenses**.

8. Any credit card information, bills, and payment records pertaining to violations of **Subject Offenses**.

9. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting a person to, violations of **Subject Offenses**.

10. Any stored information reflecting communications regarding illegal activities among and between members and associates involved in the **Subject Offenses**;

11. Evidence of user attrition showing who used or owned the Device to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, such as photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, saved usernames and passwords, documents, calendars, and browsing history.

12. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data); and any photographic form.